15-4165, Devine Henry v. Abbott Laboratories, Oral Argument, Not to Exceed 15 Minutes Precise, Notification of Addams for the Plenty of Health. Should I put this around? Sure. It's always dangerous, you know. People spill the water at the podium, but it's your discretion. Was that cautionary tale? No, it's all right. I'm just kind of joking around. I know when to take good advice. People get nervous, and they start drinking it. I hear you. Good morning, members of the panel. May it please the Court, thank you for the opportunity to present our argument this morning. My name is Sharon Kaysen-Adams, and I represent the appellant Delphine Henry. And, Your Honor, I've already reserved four minutes for rebuttal. Justices, I'd like to start my oral argument just by telling you why I took over this case when it was already dismissed for failure to prosecute. Delphine Henry worked for Defendant Appelli for 26 years. In those 26 years, she was never, ever, not once, disciplined for poor performance or for any other reason, until after she filed a race discrimination charge. The question that immediately arose in my mind when I heard those facts was, does a career employee with, at that point, 25 years of service, become a bad or ineffective employee just because she files a race discrimination charge? Or, perhaps, is the employer trying to cover up something? Has her charge revealed some truth that they don't want anyone to know? I submit to you that it is the latter, and I'm seeking reversal of the lower court's dismissal. Delphine Henry was the subject of race discrimination. She worked her way up through this organization and, according to her own supervisor, hit a ceiling. All she wanted, and all this case was about, was a chance to participate in the training that would have allowed her to take a test to be promoted. She didn't file a charge saying they didn't promote me. She's saying they didn't even give me the opportunity to be promoted. The lower court got one thing right in this case, and that is this. In 2009, the lower court found that we established a prima facie case of race discrimination. What the lower court got wrong was that they said we did not submit sufficient evidence to prove pretext. As to the 2009 claim you're talking about? Yes, and I was going to illuminate that a little bit, but perhaps it's not necessary. The lower court, what they did was they looked at each year separately because each failure to allow her to participate in the training was a distinct event. And pursuant to the defendant appellee's policy, the training was offered two times a year, generally speaking, in February and August. So February and August of 2009, February of 2010 are all in play. So the court looked at 2009 first and said that we didn't establish sufficient evidence of pretext. I think the lower court was looking for a smoking gun. Unfortunately, this is a circumstantial case. There are no blatant use of the N-word here, no racist commentary. It's a circumstantial case. But this is a perfect case for a jury to sort out the facts. Defendant's so-called legitimate nondiscriminatory reason for denying my client the opportunity to participate in the training is insufficient to explain why they didn't allow her to do that. What was it for 2009 again? Well, I never really got a clear answer on that, Your Honor. But basically it was she didn't feel she was ready. You may hear my colleague say something about surveys that were circulated that said she wasn't ready, surveys that were completed by coworkers. No such surveys were circulated at this point. It would have been 2008 or 2009. No such surveys were circulated. The supervisor did not identify her as a candidate, so she had no chance. So there were objective criteria that were testified to that you have an acceptable rating, meets expectations, something like that. You look perplexed. I'm sorry. Well, I'm trying to make sure I understand your question before I speak. There was testimony that what happens? Well, you need a certain amount of experience, and you have to perform in a qualified manner in your job. Correct. And the way that happens, they know that, is by their rating system, whether you're exceeding expectations, meeting your performance standard, or not meeting them. And for the year leading up to this, she performed satisfactorily. All of her evaluation satisfied the objective criteria, and she had been there long enough. It satisfied the objective criteria. And then the next thing that was supposed to happen is that she would be recommended, and then she'd go through the training, and there would be evaluations. But she never got to that point because she was never recommended. That's correct. For 2008, for the year 2008, she received an AE on her performance evaluation. Two supervisors and their boss all testified that that meant she was fully functioning in her role. That is one of the initial qualifications for the next roll-up, the Consumer Relations Rep 2. She satisfied that initial qualification. She was not nominated, and thus she didn't go through the training, as you said. I'd like to point out that at this point, and one of the things, unfortunately, that you see in the appellee brief is that they conflate the timeline because it suits their purposes. But at this point, 2008 and then early 2009, no discipline, no poor performance, no performance improvement plans, none of that. So she was on equal footing with the similarly situated individuals, the Caucasian employees, who were nominated and allowed to go through the training. And she files the charge with the Ohio Civil Rights Commission in May of 2010, correct? Correct. Okay, go ahead. And I think the timing is absolutely imperative in this case. May 2010, she files her charge. And I'm going to move to the retaliation claim, not because the other ones aren't important, but because time is of the essence. With the retaliation claim, May 2010, she files a charge. June 2010, she receives for the first time an unprecedented not achieving on a call quality score. July, she complains to the Employee Relations Department and the Corporate Department. December 2010, her boss contacts the Employee Relations Department in Chicago about putting her on a performance improvement plan. Now, I'm not going to say that there was one incident of a disciplinary action in October, November 2010. She has admitted that. It was a legitimate mistake for which she was disciplined. That was giving the password to somebody on the phone? So that's December of 2010? Correct. Okay. How much of what you just said preceded that? I mean, most of it. Did any of it not precede it? Let me put it that way. Well, everything preceded it up until this point. Okay. In other words, May 2010, she files the charge. Right. But, I mean, all this stuff you said about the bad, you know, the first time she doesn't get an A.E. rating, I mean, that was before the event where she gives the password improperly, right? That's correct. So to drill it down to even more detailed facts, which I know you have plenty of those to look at, for the first five months of 2010, before the Employee Relations Department was aware of her charge, they give monthly call quality scores. It's a call center. She gets an A.E. They don't score for January. She gets A.E. for February, March, April, May, and then June, after they find out about the charge, she gets an N.A. for the first time. Ever? I would like to say yes to that. I can't swear to that, so I won't, but I'm aware of it. So far as the record shows, yeah. Are you relying solely on the temporal proximity as evidence of causation? No, I'm not, although that's strong evidence. In my view, it's very strong evidence, especially some of the stuff that happened afterwards. But there are comments made by employees that are pretty high up in the organization about their efforts to, well, Ms. Henry's supervisor's boss's boss said that if she were a new employee, he'd be looking to fire her. That's in the notes of the Employee Relations Department. Is that after the password incident? That was after the password incident, but was also in May, June of 2011, so it was well past that incident. But I don't really understand how that you can say that's evidence that they're trying to fire her for the specific reason that she filed the charge with the Ohio Civil Rights Commission. It's evidence that they were paying special and close attention to her, and they continued to pay special and close attention to my client more than any other employee. So as I said from the outset, this is a circumstantial case. But when you've got the employee relations senior manager saying, we can tell the story about why she wasn't promoted, but not the story about why she's an N.A., I feel that's strong evidence. When they find out that there's a probable cause determination from the Ohio Civil Rights Commission on April 28, 2011, and on April 29, 2011, they're talking about what their formal action's going to be against her, I consider that pretty strong evidence of pretext, and I hope you will, too. Thank you very much. You'll have your rebuttal, and we'll hear from Abbott Labs. May it please the Court, my name is John Klinghoffer. I'm here with my colleague, Kyle Walther, and we represent Abbott Laboratories, the appellee in this matter. Just to address one point before I start my presentation, and it's regarding the timing. It was articulated to the Court that the first time in June of 2010 was she rated as a P.A. with respect to her call quality. And one thing that wasn't mentioned to the Court is that in June 2010, there was a new system put in place, a system that it's undisputed that Ms. Henry had a difficult time employing. They used this system to assist in answering the call. Yeah, but whether – okay, so they have a new system, and by coincidence, this is a month after she files her charge. If we're talking about causation here, why is all of a sudden the roof falling in on her at Abbott Labs? Why isn't that classically the sort of thing a jury should sort out? Well, I think the reason is simple, and I'll stick with the retaliation claim, and then I'll move to the discrimination claims. Here, Ms. Henry had a terrible year in 2010. She had a terrible year. Starting with when she filed her charge, it seems. Exactly, but it's undisputed. If you understand my import there. I do, I certainly do. But what's undisputed is that during 2010, and we already talked about the situation where she gave out her internal password to a caller that allowed the call. In December of 2010. Exactly right. Also during that same year, which is after she filed the charge, this is her actions, not Abbott's actions, right? During that same year, she's on the phone with a caller who's calling about a product, a recall, and it's a voluntary recall on Abbott's part. They voluntarily recalled it. Ms. Henry articulates to the caller that it was a mandatory recall. That's something that Ms. Henry admits was a significant error the same year she took that action. What month was that? That was in November or October. So this is stuff late. I understand your point, and one could make an inference. But if we're here asking whether it's a matter of law, there is no causation, I'm hard pressed to see why this isn't a jury question. If you're getting chased for five months at work, then maybe she starts to get a little rattled after all that. Just let a jury sort that out. The court didn't even get to causation, and the reason it didn't get to causation is because it wasn't a material adverse action that she suffered. She wasn't terminated. Despite all of these actions, Abbott never made an effort to terminate her. So now you're talking about constructive discharge. Well, I'm talking about the material adverse action element of the retaliation claim. Didn't the court use sort of an old standard? No, it actually used the correct standard. It used the material adverse action standard. It specifically articulated it in its opinion. It wasn't the old standard. It was the right standard that it used, applied to the facts of this case. And she didn't suffer an adverse action. What is she alleging? She's alleging one of the adverse actions, material adverse actions she suffered, was a PA on her 2010 performance evaluation. Again, that evaluation rated her performance in 2010, and she admits it was a terrible year. It was a year she performed worse than in any other year. That's her own words. What else is she alleging is an adverse action? Well, I was subjected to increased scrutiny. What's the increased scrutiny? Well, I had more sit whips than I used to. A sit whip is when someone comes and sits next to her and monitors her performance. Well, how much more often was it? Well, it happened a little more frequently than it did in the past. Her own testimony. So if they lower her rating for the first time in her tenure in this position, if they lower, let's say a jury finds that they gave her a worse score in June of 2010 than ever before because it was in retaliation for filing that charge, isn't lowering somebody's evaluation an adverse employment action? Let's just focus on that. Sure. I would argue that it isn't, and it certainly isn't in this case. Do you have a case that would say knocking somebody's evaluations down is not an adverse employment action? There was a case cited in my brief, and I apologize for not knowing it off the top of my head. Okay. Do you think that's the law? I think it's the law. You can knock somebody down, you're doing outstanding, outstanding, outstanding, unsatisfactory, and that's in response to some legitimate complaint, and that's not adverse enough for a retaliation claim. Is that your view of the law? That's my position, and it's certainly my position with respect to this case. When we asked Ms. Henry, what was done to retaliate against you? And she didn't articulate about one little, one call sheet. They get these monthly reviews of their calls. She didn't articulate. She said my 2010 performance review. That was my adverse action. But there is a litany, and there was a litany of bad performance in 2010 admitted by her. That's a different question. Excuse me? That's a different question. The question, that's not saying it's not an adverse action. That's saying we had a reason for it. That's not what you were being asked. The question is whether a bad performance review is an adverse action. Right. I think you're saying it is. That's right. You had a reason for it. Well, I'm saying it is because the law says it's not an adverse action, and I'm saying, at least the law cited in our brief does, and I'm also saying it's not in this case regardless because it was based on objective criteria that she admits behaving in, objective. So in that regard, the court was exactly right saying that she didn't say whether it's adverse is different from whether you had a reason. You could fire her for a good reason. It's an adverse action, but it doesn't give rise to liability. So you're conflating two things when you say, well, we had a good reason. I was attempting to answer two and one, but I'm clear. I believe it wasn't an adverse action, and in this case I also happen to believe that it was given for a perfectly good reason and one that had nothing to do with race. So if I can move on to discrimination claims just because. The failure to promote stuff? Exactly. Yeah, that's what I wanted to talk to you about. Yeah, sure. One of the big issues that wasn't mentioned to this court at all was that Ms. Marvin identified Ms. Henry for promotion in 2004 and again in 2006. Before she files a charge. Their whole theory is things go south after she files a charge. No, there's no allegation that these failure to promote were retaliation for anything. These are discrimination claims. So what? So she was considered in 2003 or 2004? If I could finish, I'll tell you why I think it's important. I think it's important that Ms. Marvin, the same individual who didn't identify her for promotion in 2009, had previously identified her. Ms. Henry didn't get by the first step. What's the first step? Well, the supervisor, in this case Ms. Marvin, hands out surveys to senior representatives and coordinators who interact with Ms. Henry on a regular basis. So that we get their input on whether or not they think she can handle the type of calls, the complex calls that a CR2 does. Enough of those surveys were negative in both of those years. Which years? 2004 and 2006 that Ms. Henry didn't move on in the promotional process. Now, Ms. Marvin, who views and witnesses Ms. Henry's performance on a daily and a regular basis, determined that between 2006 and 2009, I didn't see enough of improvement in the areas they identified to identify her in 2009. And the judge correctly ruled that that decision that she made wasn't pretext for race. There's simply nothing to put race to that. In fact, if you look at the CR2s in the department, there's a multitude of African Americans there. All right. Let me ask you a question. Sure. I don't see in this record where you stated a legitimate reason for the action, failure to promote, for 2009 or 2010. I mean, it seems like you jumped to saying, well, they haven't shown pretext. But you have to give a pretext for what? What is the reason that is purportedly pretextual? And I don't see it. Well, where in the record have you laid that out as opposed to arguing it here today? We articulated, I think, in our lower point, in the lower court brief, that Ms. Marvin didn't believe she was ready. And why didn't she believe that she was ready? Again, because of Ms. Henry. That's the reason. So the reason is Ms. Marvin thought she had not progressed enough. That's exactly right. Is that – I mean, okay. Because, I mean, it just doesn't really seem to be there. But that's not – that's one side of the story. The other side of the story is that there's testimony all over the place that you have to be – you have to have a certain amount of experience, which other people didn't have and were promoted anyway. And you have to have a certain level of rating. And she had it. She had the requisite overall rating. Absolutely. And because of something that happened years prior, she was not put forward the way everybody else who meets those two criteria are put forward. Well, I think, first of all, what you just stated isn't in the record. There isn't anything in the record about everybody else who was put forward. That's simply not there. I think there's some testimony that there was only one CR-1 that didn't – Who was put forward. There isn't any testimony with regard to all the CR-1s who weren't put forward. There was testimony regarding one CR-1 who was put forward and didn't get promoted. And that was an African-American who was put forward by Ms. Marvin. Her name was Marvell Harrell. And Ms. Marvin identified her as a candidate for – And she didn't put her name forward. She could have put her name forward, and maybe there would have been negative reviews, but she didn't. And again, that's part of the promotional process. The supervisor – just because someone meets these criteria, it doesn't mean that the supervisor every time puts up the individual for promotion. There's nothing in the record to suggest that. They put who they believe is a candidate. And based on her observations of Ms. Henry's performance during the interim and the last time she was rated, and now she didn't see the improvement. But again, this isn't just an African-American situation. Ms. Marvin is promoting custom-service REV-2s to senior representatives, promoting them to quality coordinators. Toetta Browdy, who reported to Ms. Marvin. Again, there's nothing in the record to tie any of this to race. And that's why the court didn't find pretext. There's nothing there, because other African-Americans were treated fine and succeeding. It was Ms. Henry's performance that was the problem here. And that's a nice argument for the jury. I think the judge got it right. Can you give us a cite to the record where you'd point to this as evidence of Ms. Marvin's reason for not putting forward Ms. Henry for promotion in 2009-2010? Is there a deposition page or something that you would point to and say that's our evidence that she had a legitimate reason? Yeah. I mean, in the briefing, there is citations to a specific record testimony that Ms. Marvin articulated. In your brief? She was ready. I believe so, Your Honor. Because, I mean, frankly, you know, we have cases where somebody comes in and they make a characterization about deposition testimony. If it's correct, there's a genuine issue, and they get to go to trial. Right. Here, you know, you're making a characterization for the opposite purpose. And I'm just, frankly, kind of holding you to the same standard. Yeah, no, I appreciate that. You know, usually what I'm looking for is a page number in the record, not sort of my recollection of what somebody said. And I'm just wondering if you're able to provide us with that pinpoint citation to the record which would support the legitimate reason that you're arguing. I guess I'd refer to page 27 of our brief. There's repeated record cites there. Okay. Page 27. Yeah. It says, Ms. Henry cannot establish the rationale for not promoting, et cetera, heading two. Are we looking at the same thing? No, we're not. I'm looking at a – Oh, you're looking at a district court document? I'm looking at the appellate court document on page – excuse me, it's record page 36 in the court's record. The brief page was 27. Oh, okay. Okay. And we have – All right. How can you look for additional – No, that's fine. I mean, I just – you know, I want to know what part of the record you're thinking of when you say that. I understand. I appreciate it. One other thing I want to talk about is with respect to the 2010 claim, we haven't talked at all about the fact that the court found that she couldn't state a prima facie case. The what? Right. The court. I'm sorry if I'm walking away from – The 2010. Yeah. In 2010, they articulated that – the court articulated that she couldn't state a prima facie case because she couldn't identify any similarly situated individuals. Because they have a different supervisor. Well, yeah. Rachel White had a different supervisor. That seems like a wrong – Well, first of all, this court has held, right, that Mitchell is still the standard, but there may be circumstances when an employee doesn't have to show the same supervisor. I would strongly argue that this is the case for it. Here, Ms. Marvin is the individual who didn't identify her for promotion, right? We need to look at what Ms. – how Ms. Marvin treated African-Americans as compared to how she treated whites. And in the lower court, the entire argument with respect to the 2010 promotion was Rachel Wallace, who reported that Julie Matovich, it has no bearing – Yeah, no, I mean, I understand the logic of what you're saying. But isn't the case law – doesn't it limit the same supervisor requirement for purposes of similarly situated to disciplinary situations? Isn't that the law as it is? I don't think it's limited to – I think you take a look at the case and determine whether or not that factor needs to be applied. And in this case, I think it's the right standard to apply. There's also some argument, and I have 16 seconds left, regarding three additional people who Ms. Henry argues should be considered similarly situated, and the district court erred when it didn't consider them similarly situated. However, there's nothing in the argument for the district court, other than these three people's first and last names, regarding who they – when they were promoted, who they reported to, what the performance was, or anything. So the district court didn't have the tools to find that they were similarly situated, and rightly found that they weren't. And for that reason, the district court's ruling must be affirmed. All right. Thank you, Mr. Klinghoffer. Any further questions? No. All right. Thank you. Appreciate it. I hear a rebuttal. Thank you, Your Honor. With regard to the same supervisor argument, I think the case law is pretty clear that it doesn't apply in every case. But I'd also like to point out that when submitting a position statement to the Ohio Civil Rights Commission, the defendant, Appellee, used an employee who worked for Julie Matovich to compare to my client, not from her own supervisor, when they attempted to argue that she hadn't been discriminated against. But all three supervisors reported to one manager, right? The ultimate decision-maker, the director, Julie Bugard is the last name. I lost her first name. It was the director. And I would argue that she was the ultimate decision-maker because specifically in March of 2010, Ms. Henry went to her and asked her basically to overrule what her manager had not done, asked her to nominate her. And she, according to Marvin and to Bugard, backed her supervisor 100 percent. That's testimony. Regarding the question you were asking about why she wasn't chosen, I've cited extensively in my brief, but I would point to Marvin Depo, record 61-1, page ID 1980 and forward, where I asked Ms. Marvin specifically to compare my client to other employees who worked for her, received the same performance rating, had no discipline, and basically what it boiled down to year after year is, well, Delphine's just not ready, or she slips back, or she doesn't sustain her performance. How long do you have to sustain your performance? For some people, apparently white people, you only have to sustain your performance for a period of months. But for Delphine Henry, if she couldn't sustain her performance for 10 years, it wasn't enough. In June 2010, my colleague mentioned the fact that there was a new system put in place, Salesforce.com. I would also point to the fact that for the remainder of 2010, there were several months after that system was put in place that they didn't take any call quality scores because of that system. But in June 2010, they did. What period did they not take call quality scores? Your implication is everybody was having a hard time. That's my implication, exactly. And that's exactly what it says in the records of the call quality scores. But I apologize, I don't have every single document. You're doing pretty well. They did score for June. I think they skipped scoring for like July, August, and September. And basically what it said on the sheets was because of Salesforce.com. 2010? Correct. Okay. And for the 2010 performance evaluation, my client received a PA, partially achieving for her call evaluations, even though her average score was an AE. So, again, more evidence, more circumstantial evidence that she was the subject of increased scrutiny and material adverse action. She was the subject of increased documentation that was going from her supervisor's desk up to the corporate office in Chicago. There was one document where they were tracking her hour by hour. She received a letter of expectation, which is what ultimately convinced her that she was going to be fired. The letter of expectation told her that she had 60 days to improve. The call quality scores used to substantiate that letter of expectation were different than the call quality scores that were submitted to Ms. Bugard. I think your time's up. It is. Well, no, I have 19 seconds. You do? Okay. That's rad. All right. Go for it. Anyway. It is going up. It means you're over. You went over. It's okay. Do you have any questions? I was doing such a good job of the clock. Okay.  Thank you, Your Honor. Well, you only went 19 seconds over. That's not too bad. Thank you, Your Honor. Thank you both for your arguments. Thank you, Your Honor. The case will be submitted. Clerk may call the remaining case for oral argument.